LUCY PARKER v. MICHAEL J. NOTHOMB.*

FILED JULY 1, 1902. No. 11,908.

Commissioner's opinion, Department No. 1.

Bastardy: UNMARRIED WOMAN: STATUS. The word "unmarried," in section 1, chapter 37, Compiled Statutes of Nebraska, does not properly refer to the mother's status at the time of making the complaint in bastardy, but only to such status at such time as it will affect the question of the legitimacy of the child, or the liability of the husband to support it.

ERROR from the district court for Seward county. Action by Lucy Parker, *nee* Lucy West, against Michael J. Nothomb for bastardy. Tried below before SORNBORGER, J. *Reversed*.

The complaint herein made was filed after the marriage of the prosecutrix to one Parker; and the question at issue

*Rehearing allowed. Reversal adhered to. See opinion, page 315, *post*.

was whether or not the prosecutrix should be unmarried when she made the complaint as well as when she bore the child. The briefs were full and instructive. But the question is so thoroughly discussed by the learned commissioner that an abstract of the briefs is deemed superfluous.

*Abbott & Abbott, T. B. Parker* and *D. C. McKillip,* for plaintiff in error.

*T. L. Norval, Richard S. Norval, B. F. Norval* and *M. D. Carey, contra.*

HASTINGS, C.

Only one question is presented in this case,—the construction to be placed upon the opening clause in section 1 of chapter 37, Compiled Statutes, relating to illegitimate children. The provision is "that on complaint made to any justice of the peace in this state by any unmarried woman resident therein, who shall hereafter be delivered of a bastard child, or being pregnant with a child which, if born alive, may be a bastard, accusing on oath or affirmation any person of being the father of said child, the justice shall," etc. The complaining witness made the following complaint: "On this 2d day of April A. D. 1900 Lucy Parker formerly Lucy West, a resident of Seward county, Nebraska, personally appeared before me, J. J. Thomas, county judge in and for Seward county and state of Nebraska, who being by me first duly sworn on her oath says that she is now a married woman but at the time of the birth of the child hereinafter set forth and at the time the same was conceived was an unmarried woman and resident of said county and state, and that she was on the 29th day of April, 1897, delivered of a male bastard child and that said child is now living and affiant further says that Michael Nothomb, name otherwise unknown is the father of said child, and further affiant sayeth not."

Examination was held and defendant gave bail for his

appearance in district court. There he pleaded "Not guilty." A jury was impaneled. Objection was then made to. the introduction of any evidence on the ground that the complaint stated no cause of action. This was sustained, and by instruction of the court a verdict of not guilty returned. Motion for new trial was overruled, and error is brought to reverse the judgment of dismissal.

The sole question is whether "unmarried," in the statute, relates forward to the following clauses, or back to the complaint. Must it be the complaint of a woman unmarried at the time of making it, or merely the complaint of a woman unmarried when delivered of a bastard child or pregnant with one? It is held in *Johnson v. State,* 55 Nebr., 781, that the complainant at the time of the birth of the child must be an unmarried woman, and that the evidence must affirmatively show it. Her status at that time fixes that of her offspring. 'If she was then a married woman her child will not be a bastard. It is held in *Myers v. Baughman,* 61 Nebr., 818, 820, that the purpose of the statute is twofold: To require the putative father to support his offspring, and to protect the county in which the child is born. *Stoppert v. Nierle,* 45 Nebr., 105, and *Ex parte Cottrell,* 13 Nebr., 193, are cited, and are to the same effect.

That the marriage of the mother after the status of her illegitimate child is fixed should be made to relieve its father of all responsibility, is clearly against the general intention and object of this statute. Her husband, by the mere fact of marriage, would not be under any obligation to support the child. Schouler, Domestic Relations, sec. 273; *Mowbry v. Mowbry,* 64 Ill., 383. '

It is claimed that this statute is penal, and its provisions should be strictly construed. Such a holding is not in conformity with the rulings of this court. In *Stoppert v. Nierle, supra,* it is held that the number of challenges allowed in the selection of the jury are those provided in civil actions, and not those in criminal proceedings. It has also been frequently held that a mere preponderance

of the evidence is all that is necessary to uphold a verdict of guilty in these cases. *Robb v. Hewitt,* 39 Nebr., 217. A provision for the maintenance of helpless children other-wise without claim upon any one but the mother, is certainly remedial in its nature, and, it would seem, should be construed as a remedial statute.

The industry of counsel has brought together the adjudications upon this subject. The holdings, where the question has been directly raised in courts of last resort, seem to be uniformly to the effect that the provision of the statute has relation to the status of the mother at the time of the conception and delivery of the child, and not at the time of the making of the complaint.

In England, under a provision that a "single woman" may make a complaint, it is held that a woman living without access of the husband answers to the description. *Regina v. Pilkington,* 2 El. & Bl. [Eng.], 546; *Regina v. Collingwood,* 12 Q. B. [Eng.], 681; *Rex v. Luffe,* 8 East [Eng.], 193.

In Illinois, under a statute identical in meaning, and almost so in form, with ours, in *People v. Volksdorf,* 112 Ill., 292, the precise case here was held to entitle the complainant to proceed; and the opposite holding of the appellate court in the same case, in 12 Bradwell, 534, was reversed.

In Vermont, under a statute as follows: "That when any single woman shall be delivered of any bastard child, or shall declare herself to be with child, and such child is liable to be born a bastard, and shall in either case, charge any person, in writing or on oath," etc., it was held that it was competent to proceed in the name of the woman under a complaint almost identical in terms with the one that we have here, although in that case the action was carried on jointly by the complainant and the town. *Sisco v. Harmon,* 9 Vt., 129.

The court, both in Illinois and in Vermont, holds that the provision as to the status of the complainant, has reference only to the time when her child is conceived and born.

In North Carolina, under a statute like that of Vermont, a woman who was unmarried at the time of the birth of two children, after marriage to another party, entered bastardy proceedings against the father; and the court held that she was entitled to carry them on,—making the same holding as in Vermont as to when the requirement that she be a single woman should be held to have application. *Wilkie v. West,* 1 Murph. [N. Car.], 319.

These are all the cases which counsel's industry has brought forth where courts of last resort have passed upon this point under the state of facts here presented.

In Ohio, in *State v. Brill,* 29 Weekly Law B., 190, the court of common pleas dismissed the complaint of a woman who was married at the time of filing it, though unmarried when her child was begotten and delivered. Such action is based on several opinions of the supreme court of that state, which are broad enough in their terms to include the case which the common pleas court had under consideration, but in each of which the status of the complainant was wholly omitted to be mentioned, or else it appeared that she was a feme covert at the time of the conception and of the birth.

It is contended that to restrict the application of the term "unmarried woman" to the time of the conception and birth of the child is judicial legislation, and violates the plain intention of the statute. It is further claimed that this is unnecessary, because of the following section, which makes provision for the county authorities bringing the action where the mother neglects to bring or to prosecute it. It certainly seems harder to find authority under that section for the county to take action where the woman has done so and been denied, than it is to find authority for her proceeding after her marriage under the previous section. It could not be a neglect to bring or to prosecute an action which produced the failure, except on a much more forced construction of the statute than plaintiff asks here.

Citations are given us from other states, **including**

Alabama, Florida, Kentucky and Indiana, where holdings have been made that it must appear that the complainant was unmarried. But those cases, like those in Ohio, fail to indicate any conclusion as to the precise question here, namely, when she must be unmarried. They are all cases in which the woman's status does not appear at all, or else where her coverture at the time of birth or conception of the child prevented her recourse to the statute. ·

It is urged that the construction sought by plaintiff in error would render the amendment of 1875, inserting the word "unmarried" in place of "any," meaningless. This seems not to be the result. The intention of that change apparently was to do away with any attempt to establish bastardy by reason of non-access of the husband in the case of a child born of a married woman. It seems also to have been intended, as is held in *Johnson v. State,* above cited, to do away with any attempt on the part of married persons to avoid responsibility for the support of offspring. Both of these objects are as completely reached by holding that the term "unmarried" has application only to the time of the conception and birth of the child, as by including also the time of making the complaint. As is before suggested, the husband would by the marriage incur no liability for another man's child previously born. The sole reason for holding that this required status of the mother has relation to the time of filing the complaint seems to be the collocation of the words in the statute, and the grammatical effect of such collocation. This, of course, must not be arbitrarily disregarded in construing a statute. It, however, should not control where the intention of the legislature requires it to be disregarded. *Schuyler v. Hanna,* 31 Nebr., 307.

The recent case, *McGavock v. Omaha Nat. Bank,* 64 Nebr., 440, in this court, makes a similar holding in regard to the words of a contract. In that case the contract had reference to an extension of time on a note, which the circumstances indicated was only to be until a certain case was decided in this court. The agreement provided that it should only be good "until said case should be decided

Parker v. Nothomb.

in the supreme court, or for not to exceed two years from the date of the agreement." This court held that the intention should be gathered from the whole circumstances, and that the final clause did not grant an alternative for, but provided a limitation upon, the preceding one. The argument would seem at least as strong that the intention of the legislature was to establish a provision for bastard children; that the amendment of 1875 introducing the word "unmarried" into this section, meant only to shut out the inquiry as to non-access of the husband, and the question of liability for the child by one marrying a pregnant woman. To do this, it is only needed that the requirement as to the status of the mother be held to apply to the time of the child's conception and birth. It has been so applied in *Johnson v. State, supra.* To hold that it applies also to the time of filing the complaint would be to defeat the main purposes of the act, as to one class of children, by a provision as to means. It would be to leave the bastard whose mother should marry before the institution of proceedings remediless. "It is, as will be seen presently, construction alone which saves us, in many instances, from sacrificing the spirit of a text, or the object, to the letter of the text, or to the means by which that object was to be obtained. And, without construction, written laws, in fact any laws or other texts containing rules of actions, specific or general, would, in many cases, become fearfully destructive to the best and wisest intentions, nay, frequently, produce the very opposite of what it was purposed to effect." Lieber, Hermeneutics, 45.

It is recommended that the judgment of the district court be reversed, and the case remanded for further proceedings.

Day and Kirkpatrick, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the case remanded for further proceedings.

REVERSED AND REMANDED.

The following opinion on rehearing was filed February 4, 1903:

1. **Construction of Statute:** STRICT LETTER OF LAW: ABSURD CONCLUSION: TRUE INTENTION OF LEGISLATURE: LITERAL SENSE. In construing a statute, the strict letter of the law ought not to be followed when such an interpretation would lead to an unreasonable or absurd conclusion. The court will endeavor to ascertain the true intention of the legislature, and give it effect, rather than the literal sense of the terms employed.

2. **Bastard Child:** COMMON LAW: DEFINITION. At common law, a bastard child was one born neither in lawful wedlock nor within a competent time after its termination, or under circumstances which render it impossible that the husband of its mother can be its father.

3. **"Illegitimate Children":** STATUTE: PROSECUTRIX. Under the statute entitled "Illegitimate Children," prior to its amendment in 1875, an action in bastardy could be maintained by any woman giving birth to an illegitimate child, even though begotten and born during the existence of the married state.

4. ——: ——: ——: ACTION. By the amendment of the statute in 1875, which was entitled "An act for the maintenance and support of illegitimate children," an action can be maintained only by a woman who, while unmarried, has become pregnant with a child which, if born alive, would be a bastard, or has been delivered of an illegitimate child.

5. **Meaning of the Word "Unmarried," as Used in the Statute.** The word "unmarried" as used in the statute as amended in 1875 (sec. 1, ch. 37, Compiled Statutes, 1901, entitled "Illegitimate Children"), properly refers to the status of the mother at the time her child is begotten and born, and does not relate to her situation at the time of making the complaint therein referred to.

HOLCOMB, J.

This cause is submitted on a rehearing heretofore allowed. The controversy is with respect to the proper construction of section 1, chapter 37, Compiled Statutes, 1901, entitled "Illegitimate Children." The direct question presented is whether, under the statute referred to, an unmarried woman who has given birth to an illegitimate child, and subsequently thereto marries, may after such marriage maintain an action against the putative father for the

support of her illegitimate offspring. At the former hearing the word "unmarried," in the section referred to, it was held, does not properly refer to the mother's status at the time of making the complaint in bastardy, but only to such status at such time as will affect the question of the legitimacy of the child or the liability of the husband to support it. The former opinion treats of the propositions involved at some length and is referred to in connection with what is here said for a more comprehensive understanding of the views we entertain regarding the matter. Reiteration will serve no useful purpose and we shall attempt to avoid it. A brief in support of the application for a rehearing so ably and persuasively argued the question in favor of a contrary construction as to induce the court to grant the motion, for the purpose of more fully investigating and considering the subject, and to arrive, if possible, at a right decision of the controversy.

The statute reads: "That on complaint made to any justice of the peace in this state by any unmarried woman resident therein, who shall hereafter be delivered of a bastard child, or being pregnant with a child which, if born alive, may be a bastard, accusing on oath or affirmation any person of being the father of said child, the justice shall take such accusation in writing," etc. Sec. 1, ch. 37, Compiled Statutes, 1901. It is earnestly insisted by defendant's counsel that because of the language just quoted, the mother of a bastard child, who, subsequently to its birth and before instituting the proceedings therein contemplated, marries, can not thereafter bring or maintain an action under the statute. It is argued that the construction given the statute in the prior opinion is contrary to the clear import of the language therein used, and against the weight of adjudged cases bearing on the question. Chief reliance for the construction contended for by the defendant is placed on the wording of that part of the section we have quoted, and it is urged that the intention of the legislature is made so apparent therefrom that there

is left no room for any other construction as to the meaning of the language than that the mother of the illegitimate child must be an unmarried woman when she makes the complaint in bastardy, and that an allegation that she is at the time of filing the complaint an unmarried woman is essential and necessary to be made and proved in order to give her and her illegitimate child the benefit and advantage afforded by the statute. It should, perhaps, here be said that on a first reading of the statute no other view seems admissible. Nevertheless, maturer reflection and full consideration of the entire act, bearing in mind the object and purpose which the legislature had in view in adopting the statute, as gleaned from the title as well as the act itself, produces in our minds a well-settled conviction that such construction would, in a measure, defeat the intention of the lawmaking body which passed the measure. In a very recent decision we have said: "It is a well-settled rule in the interpretation of statutes that the reason and intention of the law giver will control the strict letter of the law when the latter would lead to palpable injustice or absurdity." *Kelley v. Gage County,* 66 Nebr., ——. In the interpretation of statutes courts ascertain the intention of the legislature and give effect to it rather than to the literal sense of the terms employed. *State v. Baushausen,* 49 Nebr., 558. The law is manifestly one created by a statute remedial in character, and to which resort must be had in the first instance in order to determine the legislative intendment and the objects and purposes sought to be accomplished by its enactment. In determining the character and proper construction to be given a law of the kind under consideration we should, perhaps, first consider the action taken by the lawmaking body, the changes, if any, which have been made, the reasons for such changes, and the evils sought to be remedied thereby, and thus more certainly ascertain the legislative intent and purpose. The first act on the subject was passed and approved in 1869, and was entitled "An act to provide for

the support of illegitimate children." In that act it was provided that on complaint made by "any woman," etc., proceedings should be had for the purpose of compelling the father to support his illegitimate offspring. By the wording of the statute as then enacted, the question of the status of the woman making the complaint, with reference to her being married or unmarried at the time of the birth of the child, was not made the test as to her right to maintain an action against the putative father for its support. Under such statute the questions to be determined were whether the woman, be she married or unmarried, had been delivered of a bastard child or was pregnant with a child which if born alive would be a bastard. The illegitimacy of the child was the sole test of the mother's right to prosecute the action. "At common law," it is said, "a bastard is one who is born neither in lawful wedlock nor within a competent time after its termination; or under circumstances which render it impossible that the husband of his mother can be his father." 5 Cyc., 625; *Commonwealth v. Shepherd,* 6 Am. Dec. [Pa.], 449; *Smith v. Perry,* 80 Va., 563. See, also, *Wilson v. Babb,* 18 S. Car., 59. Thus by the old statute a married woman, although such at the time a bastard child was begotten and born, could maintain an action in bastardy for the support of such child. It is said, and, we are convinced, with much merit, that a law of this character was subject to much abuse, and permitted the prosecution of an action by a woman who while in lawful wedlock gave birth to an alleged illegitimate child and resorted to the statute solely for the purpose of gain, in an attempt to bastardize a child begotten and born in lawful wedlock and thus stigmatize as a bastard one whose coming into the world was sanctioned by every law governing the marital relations. To avoid this possible condition of things, we apprehend, was the sole aim and object of the legislature in amending the law as it did in 1875 by inserting the word "unmarried" after the word "any," so that the section should read that on complaint made by "any unmarried woman," in-

stead of "any woman," as originally existing.  It can not, we think, be successfully controverted that this was the prime aim and purpose of the amendment of the statute which in all other respects was left substantially unchanged.  What we conceive to be the intention of the legislature by making the amendment was to deny to the married woman giving birth to a child, even though in truth and fact not begotten of her husband, the right to maintain an action against some third party for its support, who is alleged to be its father.  The amended act is entitled "An act for the maintenance and support of illegitimate children."  The title is, we assume, an unerring index, disclosing the object and purpose of the act.  These were to provide for the support and maintenance by the putative father of his illegitimate child, begotten and born out of lawful wedlock.  It is hard to conceive of any good reason, and we know of none, for saying that an illegitimate child should be denied the protection afforded by the statute because the mother, subsequent to its birth, enters into a contract of marriage with one other than its father. The law does not discourage marriages, and certainly the legislature did not intend to throw any impediment in the way of the unfortunate mother who had given birth to an illegitimate child to enter into a marriage alliance.  It can not be doubted, as was held to in the former opinion, that the husband of a woman contracting such marriage would sustain the legal relation only of stepfather to the illegitimate child, and would be under no legal obligation for its nurture, support and maintenance.  The child, notwithstanding such marriage, is in the same attitude with respect to the law, and in the same need of its beneficent provisions, as before the marriage.  It is as much an object of legislative solicitude as other innocent unfortunates of its kind whose mothers have contracted no such alliances.  There is in fact no substantial reason, nor can any be advanced, why the legislature intended to deny to the illegitimate child, whose mother after its birth has married, the protection of the statute, and yet extend

such protection to those in exactly the same condition whose mothers have not married. The rule is unvarying, so far as we have examined, to the effect that if the mother of an illegitimate child shall marry one other than the father after the commencement of bastardy proceedings, such marriage will not have the effect of abating the action, or relieving the putative father of the legal obligations imposed upon him by the statute. *Austin v. Pickett,* 9 Ala., 102; *Roth v. Jacobs,* 21 Ohio St., 646; *State v. Ingram,* 4 Hayw. [Tenn.], 220. See, also, *Swett v. Stubbs,* 34 Me., 178. If a marriage of the mother after the action is instituted, and before judgment, will not operate to discontinue the action, upon what substantial grounds can it be argued that a marriage before the action is instituted will be a bar to the proceedings? By what course of reasoning can it be said that a distinction exists, affecting rights under the statute, between the woman who institutes an action and then immediately marries and one who marries and immediately begins such action? As regards the illegitimate children, their legal status is exactly the same, and if one is to be denied the benefit of the law because its mother has married before instituting an action, then the legislature has not extended to it the equal protection of the law. We can not believe that this situation was in contemplation by the legislature when it amended the act by inserting the word "unmarried" between the words "any" and "woman." An examination of the entire act as originally passed, and its subsequent amendment, the title to the act, and the language used in expressing the will of the legislature, constrains us to the view, as expressed in the original opinion, that the word "unmarried," as used in the statute, refers solely to the status of the complainant at the time the illegitimate child is begotten and born, and does not have reference to her situation when proceedings are begun against the father to compel him to contribute to the child's support. What the statute does say, we think, is that when any unmarried woman who has been delivered of a bastard child

shall afterwards, and regardless of her status at the time, make complaint in writing as is required by statute, then the proceedings shall be had to charge the father with the support of his child, such as is contemplated by the statute. The word "unmarried" can only mean, if we give the language used an interpretation based on reason and in consonance with the manifest intention of the legislature, the status of the mother at the time of the begetting and birth of the illegitimate child. And this is the construction given in the case of *Johnson v. State,* 55 Nebr., 781. But it is said such a construction conflicts with the prior decision of this court in the case of *Olson v. Peterson,* 33 Nebr., 358. While the language used in that case appears on the face of the opinion to be inconsistent with the views herein expressed, yet, when considered in connection with the vital issues presented, the apparent conflict is dissipated. In that case it appears from an examination of the record and the statements of counsel in their briefs, that the proceedings were first begun during the pregnancy of the mother, and that after the birth of the child, because of some irregularity, a new complaint was filed, and yet the action was substantially a continuation of those proceedings begun before its birth. This, we think, accounts for some of the language used in briefs of counsel and in the opinion, to the effect that it is essential that the complainant be an unmarried woman when the action is begun. At the trial the defendant sought to show that for about two months during the time of gestation the complainant and a third party lived together as man and wife, and that they had in fact contracted a valid common-law marriage. On cross-examination questions were asked of the complainant by which this alleged marriage was sought to be established, the answers to which were excluded by the trial court, and because of such exclusion the judgment rendered was, on error to this court, reversed. What was sought to be established as a defense in that case, and regarding which, only, the cause was reversed, was the alleged common-law

28

marriage of the complainant prior to the birth of the child, and not subsequent thereto, and prior to the commencement of the proceedings, as some of the language in the opinion would seem to indicate. Under the issues as presented, all the court was called upon to decide, and which was in fact decided, in that case, was that a marriage prior to the birth of a child, even though illegitimately begotten, would bar a prosecution by the mother against the putative father for the child's support. Such a construction of the statute is, we think, sound, and in accordance with *Johnson v. State, supra.*

We are committed to the doctrine that the status of the mother must be that of an unmarried person at the time the illegitimate child is begotten and born, and we are now asked to go a step further and unequivocally decide that she must also be unmarried when the complaint is filed and the prosecution begun. The decisions of the supreme courts of other states are appealed to in support of the construction contended for, which will now be briefly considered. In many of the authorities to which our attention has been called, as well as some found by an original investigation on our part, some things are said and language used which give countenance and support to the contention of counsel for defendant. A thorough consideration, however, of these numerous cases, discloses that in no instance was the question now being considered directly involved in the decision of a court of last resort. Much that is said, and in many instances loosely spoken, when considered in connection with the facts and surrounding circumstances of the particular case, and the real controverted points therein decided, is altogether reconcilable with the views expressed in our former opinion, and which we yet entertain regarding the matter. A discussion of several of these cases will elaborate somewhat our views as already expressed.

As was noted in the former opinion, one of the inferior courts of Ohio has held that a prosecution under the bastardy act could be maintained only by a woman who was

unmarried at the time of making the complaint, and we need not here further advert to such holding. *State v. Brill,* 29 Wkly. Law Bul., 190. The decision, however, it is manifest, was the result of a supposed following of the case of *Devinney v. State* (decided in 1834), Wright [Ohio], 564. In that case the complainant failed to allege in the complaint that she was unmarried either at the time of coition and birth of the child or at the time of filing the complaint. The law of Ohio authorized proceedings in bastardy by an unmarried woman who shall be pregnant with or has been delivered of an illegitimate child. It is said in the opinion, "As none but an unmarried woman resident in the state can commence and carry on this prosecution the fact of the prosecutor being unmarried should be set forth to show the jurisdiction or authority of the court to proceed and we hold the omission fatal." Whether the court had in mind the situation of the complainant at the time of the birth of the illegitimate child or when the complaint is filed, we are not advised from anything that appears in the opinion. It is apparent, however, from later decisions, that it must appear from the complaint that the mother was unmarried at the time of the birth of the child, and it has not yet been directly decided by the court of last resort of that state that the marriage of the mother after the birth of an illegitimate child would debar her from prosecuting an action for its support by its natural father. In this connection, counsel for defendant say that it has been the universal practice in this state to allege in the complaint that the prosecutrix is unmarried when she makes the same, and to insert no averment with reference to her status at the time of coition and birth of the child; that this is a practical construction of the statute which should have its due weight in the determination of the question. A sufficient answer to this is, we think, that without exception, until the present case arose, the mother was unmarried when the prosecution was begun, and the general allegation in a complaint that the complainant was an unmarried

woman includes the essential averment as to her status at the time her illegitimate child was begotten and born. As heretofore noted in the case of *Johnson v. State, supra,* it is held that it is necessary to aver and prove her status at the time of coition and birth of the child, and this ordinarily is accomplished by the general averment that she is an unmarried woman.

In *Haworth v. Gill,* 30 Ohio St., 627, relied on by counsel for defendant, it is decided that under the bastardy act of that state, proceedings can not be maintained on complaint of the mother when the child in question is begotten and born during lawful wedlock. It is said in the opinion, in discussing the question at issue, that the law "was intended to provide for the support and maintainance of an unfortunate class of children, whose condition of illegitimacy would be apparent and unquestionable, by reason of their being begotten and born out of wedlock. The statute authorizes the complaint to be made either during pregnancy or after delivery. If made during pregnancy, it is certain that the pregnancy alleged must be that of an unmarried woman, and if not made till after delivery, it is equally certain that the complainant must still continue to be unmarried." Whether we are to understand from the language last quoted that it refers to the status of the mother up to the time of the birth of the child, or to the time of making the complaint, is not entirely clear. The words, as used, may very properly refer to the fact that her status during her time of pregnancy and until the birth of the child, must be that of an unmarried woman. It does not necessarily follow from what is said that the court is committed to the doctrine that if the mother of an illegitimate child, who is unmarried when it is begotten and born, marry after its birth, she can not thereafter maintain a bastardy action for the child's support. In that case the child's mother was a married woman at the time of coition and for eight months after the child's birth, and it was with reference to this condition of affairs that the court was discussing

the matter.   In a late case from Ohio (*Miller v. Anderson,* 43 Ohio St., 473), the court holds that the natural father of a child could not be held for its support under the law of that state, if the mother, after the child was begotten, and during pregnancy, contracts a marriage with another man, who marries her with full knowledge of her condition; that by such marriage the man so marrying consents to stand *in loco parentis* to such child, and is presumed in law to be its father, and that this presumption is conclusive.   The rule thus announced is in harmony with the principle controlling the decision in *Johnson v. State, supra.*

In Kansas the court of appeals (*Blush v. State,* 46 Pac. Rep. [Kan.], 185) has directly decided that a prosecution for the maintenance and support of an illegitimate child can only be maintained when the complainant at the time of the commencement of the action is an unmarried woman.   The decision follows *Willetts v. Jeffries,* 5 Kan., 470.   In the latter case the supreme court construes the statute of that state, which is similar in terms to ours, to mean that a woman must be unmarried at the time of commencing an action in bastardy, and that the word "unmarried" does not refer to her status at the time of the begetting and birth of the child.   It is there held that a married woman who has given birth to an illegitimate child may maintain an action in bastardy, provided she is divorced or unmarried when the complaint is filed.   This holding is in direct conflict with the principle announced in *Johnson v. State, supra,* and should not, in our judgment, be followed or accepted as authority in the case at bar.   Regarding the two different constructions, we are of the opinion that ours is the more reasonable, and more nearly in accord with the true intention of the legislature.

In the states of Florida (*Andrew G. v. Catherine A.,* 16 Fla., 830; *William H. T. v. State,* 18 Fla., 883; *C. T. v. State,* 21 Fla., 171; *Thomas v. State,* 37 Fla., 378), Alabama (*Pruitt v. Judge,* 16 Ala., 705; *Judge County Court v. Kerr,* 17 Ala., 328), and Kentucky (*Sword v. Nester,* 33

Ky., 453), the cases go no further than to hold that the several statutes of those states apply to single or unmarried women who have been delivered of bastard children, and who alone can maintain an action under the statute. Stating the corollary of the proposition, the rule seems to be that married women who have during coverture given birth to illegitimate children do not come within the purview of the statutes, and can not maintain an action thereunder. While in the several opinions it is said, in general terms, that single or unmarried women only can maintain the action, it is quite apparent from a reading of the several decisions that the language used by the court was with reference to the status of the complainant during pregnancy and at the time of giving birth to the illegitimate child, and not to her situation at the time proceedings under the several bastardy acts were instituted. In none of these cases is it fairly decided, nor do we think it is properly inferable from the opinions themselves, that a single or unmarried woman who has been delivered of an illegitimate child can not maintain an action under the statute if she marries after the child is born and before the proceedings are begun.

In support of the view we have adopted as to the proper interpretation of the statute, it is stated in the text in 5 Cyc., 650, that the fact that the mother is a married woman will not preclude her from instituting proceedings under the bastardy act. The key note of the controversy is, we think, fairly stated by the supreme court of Vermont (*Gaffery v. Austin,* 8 Vt., 70), where it is held that a married woman can not sustain a prosecution under the statutes relating to bastardy for the purpose of compelling the father of the child begotten and born during the coverture to contribute to its support. Such a case, says the court, is one not provided for by the statute. In the opinion it is said: "No doubt such offspring is illegitimate and bastard. It is well settled at common law, that the issue may be bastardized, although born during cov-

erture, by showing want of access, immaturity or imbecility of the husband, or any other cause which renders it impossible he should have been the father of the child; but want of access can not be proved by the wife,"—citing *King v. Inhabitants of Kea,* 11 East [Eng.], 132; *King v. Reading* and *King v. Bedall,* cited 4 Pet. Abr., 180; *Tompson v. Saul,* 4 T. R. [Eng.], 356; *King v. Luffe,* 8 East [Eng.], 193, 199; *Ex dim Lomax v. Holmden,* 2 Strange [Eng.], 940. The meaning of the statute is then discussed, and it is held that it applies only to single women who have been delivered of bastard children. Shortly after the decision in the case last cited, the same question presented in the case at bar came on for consideration, and the court decided (*Sisco v. Harmon,* 9 Vt., 129), that a prosecution under the statute could be sustained against the putative father, though the mother after the birth of the child was married, and was at the time of the prosecution a feme covert. In North Carolina (*Willkie v. West,* 1 Murphy, 319—a very early adjudged case on the subject), under a statute speaking of single women only, it is held that a married woman could maintain an action against the father of her illegitimate child, begotten previous to her marriage. *People v. Volksdorf,* 112 Ill., 292 (a case decided by the supreme court of Illinois in 1884, cited in the former opinion), holds uncompromisingly to the rule that under the bastardy act of that state, similar in its general terms to ours, complaint during pregnancy and before the delivery of the child, can only be made by an unmarried woman; but after delivery, while she is single, the subsequent marriage of the mother will not prevent her from making complaint against the reputed father of the child. Says the court, "The true construction of the statute is that the mother shall be unmarried at the time the child is born, and the word 'unmarried,' in the law, does not properly relate to the time of making the complaint." This construction appears to us as being grounded upon sound reasoning, and results in giving to the statute an interpretation in consonance with

what we conceive to be the legislative will. Any other construction, it appears to us, will lead to an absurdity, and create a distinction as to the protection afforded by the statute to illegitimate children which is without a substantial foundation in reason for its support, and is unwarranted from any consideration, save alone the mere collocation of the words used in the statute. We must ignore altogether the spirit of the law, and the humane aims and objects sought to be attained by its enactment, if we adopt the construction contended for by defendant. It is urged that the construction contended for is admissible because of the provisions found in the statute authorizing county authorities to prosecute an action in the event the mother refuses to do so. But this to us appears to necessitate a very strained construction of the provision of the statute referred to. It hardly seems permissible to say that the marriage of the mother before the action is begun must be regarded as a refusal on her part to institute proceedings to compel the putative father to discharge a moral obligation resting upon him, and a legal one imposed by statute. In this case the mother not only does not refuse to prosecute the action, but is and has been persistently knocking at the door of the court for leave to proceed with her suit. The authorities can only prosecute an action when the mother refuses.

Upon full consideration of the subject in all the different phases in which it has been presented, and with all the research we have been able to give to the questions involved, we are of the opinion the conclusion reached at the former hearing is the correct one, and should be held to as the law in this jurisdiction. The judgment of reversal is accordingly adhered to.

REVERSED AND REMANDED.

NOTE.—*Construction of Statute—Strict Letter—Absurd Conclusion—Selling Intoxicating Liquor—"And" Tantamount to "or."* Section 8 of chapter 50, Compiled Statutes, provides a punishment for any person "who shall give or sell any malt, spirituous and vinous liquors" to a minor. Is "and" tantamount to "or," or must an offender sell beer,

whiskey and wine before he can be convicted?    See, also, section 14 of same chapter.    "And" is tantamount to "or" when the sense requires it.    Bishop, Statutory Crimes, sec. 243; *People v. Sweetser*, 1 Dak., 308; *Townsend v. Read*, 10 C. B., n. s. [Eng.], 308; *Boyles v. McMurphy*, 55 Ill., 236; *State v. Myers*, 10 Ia., 448; *Miller v. State*, 3 Ohio St., 476; *Winterfield v. Stauss*, 24 Wis., 394; *State v. Smith*, 46 Ia., 670. Endlich, Interpretation of Statutes, pp. 303, 304 and 308.    *Contra* in penal statute, *United States v. Ten Cases of Shawls*, 2 Paine [U. S. C. C.], 162.    This point was raised in *State v. Sinnot*, 15 Nebr., 472, but it was not decided.—W. F. B.